[655 NYS2d 463]

In the Matter of ROBERT T. JOHNSON, as District Attorney of Bronx County, Appellant, v GEORGE E. PATAKI, as Governor of the State of New York, et al., Respondents.

In the Matter of RAFAEL MARTINEZ et al., Appellants, v GEORGE E. PATAKI, as Governor of the State of New York, et al., Respondents.

First Department, March 20, 1997

## APPEARANCES OF COUNSEL

*Anthony J. Girese* of counsel, Bronx *(Joseph N. Ferdenzi, Peter D. Coddington* and *Stephen Muller* on the brief; *Robert T. Johnson, District Attorney* of Bronx County), appellant *pro se.*

*Arthur N. Eisenberg* of counsel, New York City *(Anthony G. Amsterdam, Eric M. Freedman* and *Andrew I. Schepard* on the brief; *Norman Siegel, Christopher Dunn* and *Beth Haroules,* and *Edna Wells Handy* and *Bruce Johnson,* attorneys), for Rafael Martinez and others, appellants.

*Richard J. Holwell* of counsel, New York City *(Dwight A. Healy* and *Daniel P. Goldberg* on the brief; *White & Case,* attorneys), for George E. Pataki, respondent.

*Edward D. Saslaw* of counsel, New York City *(Christopher G. Quinn, Susan Watson, Michael S. Buskus, David Monachino, Steven Connolly* and *Michael Hueston* on the brief; *Dennis C. Vacco, Attorney-General),* respondent *pro se.*

## OPINION OF THE COURT

WALLACH, J.

On March 7, 1995, the Governor approved the first legislative enactment of his term in office, designated as chapter 1 of the Laws of 1995. Included in this legislation, most of which was to become effective the following September 1st, was a return to the death penalty as a permissible sentence (Penal Law § 60.06), for an expanded list of crimes characterized as murder in the first degree (Penal Law § 125.27). The prosecutor with jurisdiction over such capital crimes is now given the power to seek one of three penalties: death, life imprisonment without parole, or a lesser term of imprisonment for a class A-I

felony. In order to invoke the death penalty, the law now requires the prosecutor to notify the court and the defendant of that election within 120 days of arraignment upon indictment (CPL 250.40 [2]). Failure to file such notice of intent in a given case (CPL 250.40 [1]), or withdrawal of the notice after filing (CPL 250.40 [4]), forecloses recourse to a death sentence.

Immediately after enactment of this legislation, petitioner Johnson, the District Attorney of Bronx County, issued a public statement that while he intended to pursue life imprisonment without parole in every appropriate case, it was his "present intention not to utilize the death penalty provisions of the statute." In December 1995, shortly after petitioner's reelection as Bronx County District Attorney, Michael Vernon was arrested and charged with the gunshot murder of five victims in a Bronx shoe store. Since this multiple crime constituted murder in the first degree (Penal Law § 125.27 [1] [a] [viii]), the Governor inquired of District Attorney Johnson as to his intentions in the case, and specifically, whether the latter's office had adopted a predetermined policy against ever seeking the death penalty in Bronx County. Petitioner Johnson responded immediately that he intended to seek life imprisonment without possibility of parole, but declined to comment with regard to a general policy against seeking the death penalty. The Governor accepted petitioner's rejection of the death penalty in the Vernon case "with grave reservations", and indicated that he would be monitoring future cases in Bronx County to see that the new sentencing option would become as available there as elsewhere throughout the State.

On March 14, 1996, Police Officer Kevin Gillespie was fatally shot in the Bronx as he interrupted a crime in progress. Three individuals (Angel Diaz, Jesus Mendez and Ricardo Morales) were arrested in connection with the shooting. On March 19 the Governor wrote to petitioner Johnson, reminding him that he had not interfered with the Vernon prosecution despite his "serious reservations," but now demanding "assurance that you do not have a policy against seeking the death penalty." Specifically, he asked whether there were any "circumstances under which you will seek the death penalty in Bronx County". Criticizing the Governor's "heavy handed approach", which he called "tantamount to the disenfranchisement of the voters of the Bronx", petitioner Johnson nonetheless assured the Governor that he would fully comply with his oath and obligations of office, "le[aving] the door ajar, however slight, to exercise this option in the Bronx." Dissatisfied with that re-

sponse, the Governor issued Executive Order No. 27 (9 NYCRR 5.27) on March 21, requiring the Attorney-General to appear in the case and to supersede the Bronx District Attorney.

On April 16, Diaz was indicted on two counts of murder in the first degree and related offenses in connection with the death of Officer Gillespie; Mendez and Morales were indicted for murder in the second degree and related offenses. Two days later, these consolidated proceedings were commenced, challenging the Governor's superseder order. The second petition is brought by taxpayers and voters of Bronx County. On July 9, the Attorney-General announced that he would file a notice of intent to seek the death penalty against Diaz.[1] The following week, the petitions were denied, and this appeal ensued.

Included in the 1995 legislative package was Executive Law § 63-d, which empowers the Attorney-General to "assist" a District Attorney in death penalty prosecutions, upon the latter's request.[2] That new provision of law is not pertinent here since no such request was ever made. Section 63-d did not displace the already enacted section 63 (2), which broadly outlines the Attorney-General's duties pursuant to the Governor's general authority to supersede a District Attorney.

The threshold issue is the justiciability of petitioners' claims. The Governor is required to "take care that the laws are faithfully executed" (NY Const, art IV, § 3), and this Constitutional mandate is effected, in this instance, through Executive Law § 63 (2). The extent of the Governor's authority to invade a duly elected prosecutor's "zone of independence" is not a novel issue for our courts. In *Mulroy v Carey* (58 AD2d 207), the Governor had similarly directed the Attorney-General to substitute for the District Attorney of Onondaga County in the investigation of alleged illegal payments in exchange for public office or contracts. In dismissing the challenge to the Governor's exercise of authority in that case, Justice Witmer, writing for a unanimous Fourth Department, questioned whether, in virtually any situation, the courts could interfere without violating

1. On September 4, 1996, Diaz committed suicide in prison. The parties do not argue mootness, and we agree, because the issue is of such significance and is likely to recur (*cf., Matter of Hearst Corp. v Clyne*, 50 NY2d 707).

2. This statute authorizes such assistance to a District Attorney where the request is "accompanied by a certificate of need" (63-d [2]). Since the initiative is by the District Attorney, and the process is wholly voluntary, it presents the polar opposite of the superseder involved here. Also, section 63-d does not preempt other routes to obtaining the assistance of the Attorney-General (*see, Matter of Haggerty v Himelein*, 89 NY2d 431).

the doctrine of separation of powers, inasmuch as the People and the Legislature had adequate recourse, under the Constitution, to check any abuse by the executive. Citing Judge Cardozo in *People ex rel. Saranac Land & Timber Co. v Extraordinary Special & Trial Term of Supreme Ct.* (220 NY 487), Justice Witmer held that the Governor had virtually unfettered discretion and should not be required to disclose to the public the reason for his preemptive action *(supra,* at 214-215). The Court of Appeals affirmed (43 NY2d 819). Judge Cooke, in a concurring opinion, emphatically agreed with Justice Witmer's view that such executive action was beyond judicial interference. But the majority was reluctant to go that far, on the one hand affirming "for the reasons stated" by Justice Witmer, while at the same time specifically withholding any view as to "whether in any or all circumstances the exercise of the executive power to supersede an elected District Attorney would be beyond judicial review or correction in a direct or collateral action" (43 NY2d, at 821). Since *Mulroy*, no District Attorney has ever successfully challenged the Governor's authority in this area, although the message of *Mulroy* is that the door has not been closed on the possible justiciability of such a controversy. In practice, cases have uniformly found such challenges nonjusticiable, but only after full examination of the record.

Despite its notoriety, this case falls considerably short of that rarefied class that the *Mulroy* majority might presumably have contemplated. Petitioner Johnson has not met the threshold test of justiciability, which would require a showing that the Governor acted without constitutional or statutory authority *(cf., Rapp v Carey,* 44 NY2d 157). Here, the Governor acted under broad constitutional and statutory mandates, neither of which place any limitation on his powers or require him to justify his actions. Indeed, the emergent nature of his intervention was fully justified by the possibility that petitioner Johnson might take action that would foreclose appropriate consideration of the death penalty.

In furtherance of his constitutional mandate to see that the laws of New York are faithfully executed, the Governor's apparent objective was to assure that those laws are being applied in a uniform fashion throughout the State's 62 counties. The wide discretionary authority that any District Attorney does retain in executing the heavy responsibilities of his office must be held subservient to that overriding interest. The Governor had the power to determine the scope of this prosecution, before what he perceived to be the legislative will could

be locally frustrated. Within constitutional limits, the exercise of discretionary authority by the chief executive of the State in enforcing statutes is not subject to judicial review (*Gaynor v Rockefeller*, 15 NY2d 120, 131; *see also, Marbury v Madison*, 5 US [1 Cranch] 137, 170).

There is ample precedent for this expansive executive action. In 1972, Governor Rockefeller carried out the recommendation of the Knapp Commission by appointing a special prosecutor to supersede all five District Attorneys in New York City with respect to a broad range of crimes involving police corruption (*see*, Pitler, *Superseding the District Attorneys in New York City—The Constitutionality and Legality of Executive Order No. 55*, 41 Fordham L Rev 517 [1973]).

That petitioner Johnson's First Amendment freedom of expression may be tangentially implicated cannot operate to constrain the Governor's power to question petitioner Johnson about what appeared to be a predetermined policy of the Bronx District Attorney's office, and to draw a natural inference from the character of the response received.

Nor is this a case of equal protection. If anything, a sweeping renunciation of the death penalty in one county alone could itself create an imbalance, perhaps denying equal protection to first degree murder defendants *outside* Bronx County. Furthermore, the Governor's action certainly did not create a "mandatory death penalty" (*cf., Woodson v North Carolina*, 428 US 280). To the contrary, the Attorney-General's mandate is to effectuate the "case-by-case" review that petitioner Johnson arguably may have failed to conduct before announcing that he would reject the death penalty.

The only remaining issue is the standing of the citizen petitioners to bring the companion CPLR article 78 proceeding. They certainly have the right, as taxpayers (*Boryszewski v Brydges*, 37 NY2d 361) and voters (*Matter of Schulz v State of New York*, 81 NY2d 336), to challenge, on constitutional grounds, legislative enactments authorizing the expenditure of public funds. However, the substance of their claim is no more justiciable than petitioner Johnson's. They have no greater identifiable "right" to a District Attorney who universally renounces the death penalty than any other group of voters

would have to a Governor who embraces their own particular vision of Mr. Thomas Hobbes' Social Contract.[3]

Accordingly, the order and judgment (one paper) of Supreme Court, Bronx County (Howard Silver, J.), entered July 18, 1996, which denied the petitions for mandamus, prohibition, declaratory judgment and injunctive relief with respect to the implementation of Executive Order No. 27, and granted respondents' motion and cross motion to dismiss these proceedings, should be affirmed, without costs.

ELLERIN, J. P., NARDELLI, WILLIAMS and MAZZARELLI, JJ., concur.

Order and judgment (one paper), Supreme Court, Bronx County, entered July 18, 1996, affirmed, without costs.

---

**3.** *Cf.,* Justice Holmes' famous dissent in *Lochner v New York* (198 US 45, 75): "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics."