91 N.Y.2d 214 (1997)
691 N.E.2d 1002
668 N.Y.S.2d 978
In the Matter of Robert T. Johnson, as District Attorney of Bronx County, Appellant,
v.
George E. Pataki, as Governor of the State of New York, et al., Respondents.
In the Matter of Rafael Martinez et al., Appellants,
v.
George E. Pataki, as Governor of the State of New York, et al., Respondents.
Court of Appeals of the State of New York.
Argued October 21, 1997
Decided December 4, 1997.
Robert T. Johnson, District Attorney of Bronx County, Bronx (Anthony J. Girese, Joseph N. Ferdenzi, Peter D. Coddington, Stephen Muller and Jean Joyce of counsel), appellant pro se in the first above-entitled proceeding.
Arthur Eisenberg, New York City, Christopher Dunn, Norman Siegel, Edna Wells Handy, Bruce Johnson, Anthony G. Amsterdam, Eric M. Freedman and Andrew I. Schepard for appellants in the second above-entitled proceeding.
White & Case, New York City (Richard J. Holwell, Dwight A. Healy and Daniel P. Goldberg of counsel), for George E. Pataki, respondent in the first and second above-entitled proceedings.
Dennis C. Vacco, Attorney-General, New York City (Edward D. Saslaw, Christopher G. Quinn, Susan Watson, Michael S. Buskus, Steven Connolly, Michael Hueston and Jill Gross Marks of counsel), respondent pro se in the first and second above-entitled proceedings.
Richard A. Brown, District Attorney of Queens County, Kew Gardens, Roseann B. MacKechnie, Brooklyn, Victor Barall, Ann Bordley and Leonard Joblove for New York State District Attorneys Association, amicus curiae
Judges BELLACOSA, LEVINE and WESLEY concur with Chief Judge KAYE; Judge TITONE dissents and votes to reverse in a separate opinion; Judge SMITH dissents and votes to dismiss as moot in another opinion in which Judge CIPARICK concurs.
*220 Chief Judge KAYE.
By this appeal we are asked to determine whether Governor George E. Pataki had the legal authority to supersede Bronx County District Attorney Robert T. Johnson in a potential death penalty prosecution involving a slain police officer. We hold that the Governor acted lawfully under constitutional and statutory authority, and that even if the rationale for his action were subject to judicial review the superseder order here would be valid.
*221 On March 21, 1996, pursuant to article IV, § 3 of the New York Constitution and Executive Law § 63 (2), Governor Pataki issued Executive Order No. 27 (9 NYCRR 5.27), which required respondent Attorney-General Dennis C. Vacco to replace District Attorney Johnson in all investigations and proceedings arising out of the shooting of Police Officer Kevin Gillespie. As recited in the Executive Order, the District Attorney's statements, correspondence and swift rejection of the death penalty option in prior death-eligible cases indicated that the District Attorney had adopted a "blanket policy" against imposition of the death penalty.
Such a policy, according to the Executive Order, both violated a District Attorney's statutory duty to make death penalty determinations on a case-by-case basis and opened future death sentences to challenge on proportionality grounds. Given his obligation to take care that the death penalty law would be faithfully executed and the possibility that the District Attorney would take action that would irrevocably foreclose the death penalty in the Gillespie matter, the Executive Order continued, the Governor concluded that his immediate intervention through a superseder order was necessary.
Subsequently, the Grand Jury indicted Angel Diaz on two counts of murder in the first degree and related offenses in connection with Officer Gillespie's death. Diaz's alleged accomplices, Jesus Mendez and Ricardo Morales, were indicted for second-degree murder and other lesser crimes. The Attorney-General then filed notice that the People intended to seek the death penalty against Diaz.
Before the Attorney-General's announcement appellants District Attorney Johnson, and Bronx County voters and taxpayers (whose standing is assumed for purposes of this appeal), separately commenced CPLR article 78 proceedings contesting the legality of Executive Order No. 27. Supreme Court dismissed both petitions, holding that the superseder was an executive action pursuant to a valid grant of authority and as such was nonjusticiable. Alternatively, the court found that the District Attorney's pronouncements and practices provided "ample basis" for the Governor's action. During pendency of the appeals, Diaz committed suicide in his jail cell. Mendez and Morales were later tried in Federal court for their involvement in the Gillespie murder. They were found guilty of violating the Racketeer Influenced and Corrupt Organizations statute (18 USC § 1962), and their State indictments were dismissed.
*222 The Appellate Division, concluding the appeals were not moot, unanimously affirmed Supreme Court's dismissal of both petitions (229 AD2d 242). Finding that this case fell considerably short of the possible justiciable controversies reserved in Mulroy v Carey (43 N.Y.2d 819, 821), the court applied the traditional test for determining the validity of a superseder order  whether the Governor had acted within constitutional or statutory authority  and concluded that appellants had not made this requisite showing. Like the trial court, the Appellate Division went on to consider the reasonableness of the order, holding that the Governor's intervention was "fully justified" in light of the possibility that the District Attorney would take steps to preclude the death penalty in the Gillespie matter (229 AD2d at 246). We now affirm.

Mootness
We first reject the Attorney-General's contention that this appeal has been mooted by the death of Diaz, the conviction of Mendez and Morales on Federal charges, and the dismissal of the State indictments against these two defendants. An appeal presents a live controversy where the rights of the parties will be directly affected by the determination and where the judgment has "immediate consequence" for them (Matter of Hearst Corp. v Clyne, 50 N.Y.2d 707, 714). Here, a live controversy remains in at least two respects. First, Executive Order No. 27 mandates that Bronx County pay all charges incurred by the Attorney-General in prosecuting the Gillespie matter. Since the validity of the charges depends on the validity of the order  the issue before us  the appeal continues to have immediate consequence for the parties. Second, the Executive Order is not by its terms limited to the prosecution of Diaz, Mendez and Morales. To the extent that the District Attorney  who himself argues against mootness  may find it necessary to initiate additional proceedings or inquiries if the Executive Order is invalidated, the outcome of this appeal also has immediate consequence for the parties.[1]

*223 The Law Regarding Superseder
Passing from mootness to the merits, we begin analysis with a recognition that when the Governor acts by Executive Order pursuant to a valid grant of discretionary authority, his actions are largely beyond judicial review (see, e.g., Matter of Cunningham v Nadjari, 39 N.Y.2d 314, 317-318; Gaynor v Rockefeller, 15 N.Y.2d 120, 131; Matter of Nistal v Hausauer, 308 N.Y. 146, 152-153, cert denied 349 US 962).
Judicial review in such cases is generally limited to determining whether the State Constitution or the Legislature has empowered the Governor to act, and does not include the manner in which the Governor chooses to discharge that authority (see, e.g., Mulroy v Carey, 58 AD2d 207, 214-215, affd 43 N.Y.2d 819; People ex rel. Saranac Land & Timber Co. v Extraordinary Special & Trial Term of Supreme Ct., 220 N.Y. 487, 491; People v Kramer, 33 Misc 209, 219). For abuse of lawful discretionary authority, the remedy as a rule lies with the people at the polls, or with a constitutional amendment, or with corrective legislation.
Whether a Governor is empowered to supersede a District Attorney in a particular prosecution is not a novel question. We have long held that article IV, § 3 of the Constitution and Executive Law § 63 (2) together provide the Governor with discretionary authority to supersede the District Attorney in a matter (see, Mulroy v Carey, 43 NY2d at 821, supra; see also, Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 N.Y.2d 14, 16).[2] Article IV, § 3 delegates to the Governor, as head of the executive branch, the duty to "take care that the laws are faithfully executed." Executive Law § 63 (2), the legislative grant of authority, provides:
"The attorney-general shall * * * [w]henever required by the governor, * * * manag[e] and conduc[t] * * * criminal actions or proceedings as shall be specified in such requirement; in which case the attorney-general * * * shall exercise all the powers and perform all the duties in respect of *224 such actions or proceedings, which the district attorney would otherwise be authorized or required to exercise or perform; and in any of such actions or proceedings the district attorney shall only exercise such powers and perform such duties as are required of him by the attorney-general".
The statute neither limits the Governor's authority to supersede nor requires the Governor to explain that choice. Consistent with that authority, Governors have numerous times invoked the superseder power (see, e.g., Pitler, Superseding the District Attorneys in New York City  The Constitutionality and Legality of Executive Order No. 55, 41 Fordham L Rev 517, 522-527 [1973]).
In Mulroy v Carey (43 NY2d at 821, supra), this Court reserved the possibility that in some undefined circumstance, the courts could invalidate this executive action. There we upheld the Governor's superseder of the Onondaga County District Attorney, rejecting the argument that the Governor was required to establish "to the satisfaction of the court the necessity of such action" in that case (58 AD2d at 208, supra). We added, however, that
"no view is expressed whether in any or all circumstances the exercise of the executive power to supersede an elected District Attorney would be beyond judicial review or correction in a direct or collateral action or proceeding brought or defended by the county or the elected District Attorney involved" (43 NY2d at 821, supra).

Application of the Law to Appellants' Additional Arguments
Executive Order No. 27 is on its face valid, reflecting the authority granted the Governor by article IV, § 3 of the New York Constitution together with Executive Law § 63 (2). Appellants challenge its legality on several additional grounds.
The major thrust of appellants' argument  asserted from the vantage point of both the District Attorney and Bronx voters  is that the District Attorney, a constitutional officer accountable to the local electorate, is insulated from nonconsensual superseder by a "zone of independence" based on a delegation to him of exclusive authority to prosecute crimes in Bronx County (see, NY Const, art XIII, § 13; County Law § 700 [1]). Relatedly, appellants argue that the power of superseder is limited to subordinates in the executive branch (which do *225 not include the District Attorney) or to instances where the District Attorney is disabled from acting, as by reason of local conflict of interest.
The Constitution provides for the offices of Governor, Attorney-General and District Attorneys, but it does not identify particular  let alone exclusive  prosecutorial duties or allocate the responsibility among them. Rather, the delineation of law enforcement functions has consistently been left to the Legislature (see, e.g., Matter of Schumer v Holtzman, 60 N.Y.2d 46, 53).
While prosecutorial authority over the decades has in fact passed from the Attorney-General to the District Attorneys, the Legislature has recognized for more than 150 years the authority of the Attorney-General to prosecute crimes, even at the local level, when properly directed to do so by the Governor (see, Executive Law § 63; CPL 1.20 [32]; Matter of Dondi v Jones, 40 NY2d at 19, supra; Pitler, 41 Fordham L Rev at 518-522, op cit.). Nor has such authority been restricted to instances where a local conflict of interest disabled a District Attorney, an officer within the executive branch (see, People v Leahy, 72 N.Y.2d 510, 513), from prosecuting a matter. No such limitation appears in the Constitution or statutes, and none has been found in prior case law dealing with these very issues (see, Mulroy v Carey, 58 AD2d at 208-209, 214-215, supra; Matter of Turecamo Contr. Co., 260 App Div 253, 256-258; People v Malek, 99 Misc 2d 439, 442-443; Berger v Carey, 86 Misc 2d 727, 728).
Similarly, we are unpersuaded by the contention that Executive Law § 63-d, passed in connection with the recent death penalty legislation (L 1995, ch 1), implicitly repealed the portion of Executive Law § 63 (2) pertaining to first-degree murder prosecutions. Section 63-d permits the Governor to direct the Attorney-General, when requested by the District Attorney, to assist in a potential death penalty case (see, Governor's Mem approving L 1995, ch 1, 1995 McKinney's Session Laws of NY, at 2283, 2288; Mem of Assembly Codes Comm, 1995 NY Legis Ann, at 1, 14-15). Nothing in or about that section evinces a legislative intention to limit a Governor's supersession authority. In short, these statutes simply provide two different, but complementary, avenues by which the Attorney-General can exercise the limited prosecutorial authority of that State office. There is no repugnancy indicating implicit repealer.
Appellants next improperly analogize Executive Order No. 27 to the invalidated order in Rapp v Carey (44 N.Y.2d 157). *226 The challenged order in Rapp  issued pursuant to article IV, § 3 of the State Constitution and section 74 of the Public Officers Law  required a wide range of State employees to file extensive personal financial statements and to abstain from various activities. This Court held that while the Governor has "the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement" by the "take care" clause of the State Constitution, the Governor's rule-making Executive Order actually conflicted with the Legislature's intent and negated the statute it purported to administer (44 NY2d at 163). Consequently, we concluded that the order represented an unconstitutional encroachment on the powers of the legislative branch (44 NY2d at 163-167, supra). By contrast, Executive Order No. 27 does not promulgate any rules requiring District Attorneys to seek the death penalty and directs only supersession, as contemplated by Executive Law § 63 (2). Clearly then, the separation of powers concerns motivating Rapp are absent here.
Finally, we reach appellants' argument that the Governor abused his authority in choosing to supersede the District Attorney merely because he disagreed with the District Attorney's discretionary decision about sentencing. Although a Governor is not obliged to state reasons for superseder, Executive Order No. 27 does in fact detail Governor Pataki's reasons for superseding the District Attorney in this instance, and they go beyond disagreement with a discretionary decision in a particular matter. We need not define whether a standard of review, if one is applicable at all, should be reasonableness, necessity or some other standard. In any event, we agree with the trial court and Appellate Division that the challenged Executive Order expresses the Governor's executive judgment that there was a threat to faithful execution of the death penalty law that supported this particular superseder.

Response to the Dissents
A. The Titone Dissent. The Court unanimously agrees that a Governor can lawfully supersede a District Attorney in a particular matter. We part company over whether the Governor lawfully superseded the District Attorney in the Gillespie matter. The Titone dissent concludes that supersession here violated statutory law by substituting the Governor's policy choice for the legislative delegation of unfettered discretion to the District Attorney.
Whether or not District Attorneys must exercise their death penalty discretion on a case-by-case basis, clearly the Legislature *227 did not allow one or all 62 District Attorneys to functionally veto the statute by adopting a "blanket policy," thereby in effect refusing to exercise discretion. Nor did supersession substitute the Governor's policy choice for the death penalty in the Gillespie matter. As permitted by Executive Law § 63 (2), the Governor designated the Attorney-General in place of the District Attorney in prosecuting the entire matter, including the exercise of discretion regarding sentence.[3]
Indeed, this dissent avoids all reference to Executive Law § 63 (2). In enacting the death penalty statute, the Legislature  mindful of the special responsibilities of litigating such cases  authorized the assistance of the Attorney-General at the request of a District Attorney (see, Executive Law § 63-d).[4] Yet significantly, in the very same section of the Executive Law the Legislature also left unchanged the long-standing authority vested in the Governor to supersede a District Attorney in a particular matter (see, Executive Law § 63 [2]; Mulroy v Carey, 43 N.Y.2d 819, supra).
B. The Smith Dissent. This dissent concludes that the superseder lacked even a rational basis. The premise of the dissent is that the superseder was irrational because it reformulated, and indeed nullified, the Legislature's grant of discretionary authority to the District Attorney to choose whether to seek the death penalty or a life sentence in first-degree murder cases (Smith dissenting opn, at 241). What is not clear is whether the dissent derives that premise from the first-degree murder statute, or from this District Attorney's pronouncements and practices. It is in either event flawed.
We turn first to the first-degree murder statute. Plainly the grant of discretionary authority to District Attorneys does not in all cases foreclose superseder. The dissent points to Executive *228 Law § 63-d  providing for assistance by the Attorney-General at the request of the District Attorney  as the Legislature's sole authorization for the Attorney-General's involvement (Smith dissenting opn, at 241, n 5). That argument ignores Executive Law § 63 (2)  which we all agree has long provided a statutory basis for superseder even in the absence of a request by the District Attorney. The stated objective of superseder in the Gillespie matter was not to override the statutory grant of discretionary authority regarding sentencing. Rather, the stated purpose of the Executive Order was to assure that discretion would be exercised, in circumstances where the District Attorney's "blanket policy" might raise doubt that it would be, where he might have foreclosed an exercise of discretion, and where such a measure might have affected proportionality. We cannot agree with the dissent that the superseder in such circumstances lacked a rational basis.
For much the same reason the dissent's alternative premise  that, based on the conduct of the District Attorney, superseder in this matter was invalid  is also flawed. As recited in the Executive Order, superseder proceeded from the executive judgment that a "blanket policy"  never unequivocally disavowed  existed that precluded the exercise of discretion by the District Attorney. Thus, the record fails to support the dissent's assertion that the Governor acted irrationally in deciding to supersede.
Appellants' remaining arguments lack merit.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
TITIONE, J. (dissenting).
I dissent. In Mulroy v Carey (43 N.Y.2d 819), this Court refused to second guess a particular exercise of the Governor's Executive Law § 63 superseder power. However, the Mulroy Court expressly left open the question whether such an exercise "would be beyond judicial review or correction" "in any or all circumstances" (43 NY2d, at 821, supra). In my view, the highly unusual facts of this case present precisely the circumstances in which judicial intervention is warranted to correct overreaching by the State's chief executive officer.
The authority of the Governor to supersede a local District Attorney must logically be subject to at least the limitation that it cannot be exercised in a way that directly contravenes a specific legislative enactment. The Governor's supersession power is based wholly on an act of the Legislature (Executive Law § 63), *229 and, as such, its exercise may be circumscribed by legislative acts of equal dignity. Moreover, unless constitutionally authorized, an executive act that contradicts a legislative plan would violate the most fundamental tenets of the separation of powers doctrine (see, Rapp v Carey, 44 N.Y.2d 157). Thus, although I would agree with the majority that judicial review of the merits  or even the rationality  of a supersession decision would be inappropriate, I would conclude that a narrow claim that a Governor has used the supersession power in violation of law is justiciable. This case presents just such a claim.
There is no doubt about the basis for the Governor's determination to supersede the Bronx County District Attorney in this case. There was no question of corruption or the District Attorney's competence to manage the prosecution. Instead, the Governor was reacting to a public statement made by the District Attorney while he was campaigning for office to the effect that it was his "present intention" to utilize the "life without parole" rather than the death penalty provisions of the statute. After demanding assurances that the District Attorney would be willing to utilize the death penalty statute in appropriate cases and receiving what he deemed to be an unacceptable response, the Governor issued the challenged superseder order. By way of explanation, the Governor stated that "the case is one in which the death penalty is particularly warranted" and that the policy of the Bronx County District Attorney (as the Governor interpreted it) "threatens the validity" of death sentences imposed in other counties because of the statutory requirement that such sentences be neither excessive nor disproportionate (Executive Order No. 27, 9 NYCRR 5.27).
Thus, it is clear beyond question that the only reason for the Governor's superseder decision in this case was his desire to substitute his own policy choices for those of the Bronx County District Attorney. In my view, however, this motive flies in the face of the evident legislative intent that the fundamental policy choice as to whether or not to seek the death penalty be made solely by the locally elected District Attorney.
The death penalty statute is, in many respects, unique. Adopted after decades of emotional debate, this statute has many singular attributes, including the unparalleled discretion it affords the prosecutor with respect to the choice of punishment. While every other Penal Law provision identifying a crime is associated with a prescribed sentencing range for the court to consider, the first-degree murder statute gives the People the power to decide in the first instance whether to *230 prosecute an otherwise qualifying homicide as a death penalty matter (see, CPL 250.40).
Whatever else may be gleaned from the provisions of Executive Law § 63-d, the terms of that statute make clear the Legislature's assumption that death penalty prosecutions, including the initial decision under CPL 250.40 to seek the death penalty, would be handled by the local District Attorneys. Further, the absence of any statutory criteria for making CPL 250.40 decisions indicates that the Legislature intended the local District Attorneys to have unfettered discretion in this area. Significantly, nothing in the statute suggests that the determinations must be made on a case-by-case basis. Thus, under the statutory scheme, the District Attorneys may consider such factors as the heinousness of the homicide and the characteristics of both the defendants and the victims, but there is nothing to prevent them from basing their decisions on broader policy considerations such as the extraordinary commitment of money and resources that death penalty prosecutions entail, the impact that the pursuit of such prosecutions might have on law enforcement in general and perhaps even the sentiments of their constituencies.
That the Legislature intended the 62 District Attorneys of this State to have such broad discretion may be inferred from the debate that preceded the death penalty statute's adoption. In response to one Assemblywoman's expressed concerns about the reluctance of some District Attorneys to invoke the death penalty in light of the attendant expenses, the Assembly bill's sponsor stressed that "there's nothing that obligates a district attorney to seek the death penalty under this bill" (Remarks of Assembly Member Vitaliano, NY Assembly Record A4843, at 481-482 [Mar. 6, 1995]).
Manifestly, the position underlying the Governor's decision to supersede the Bronx County District Attorney  i.e., that he was required to at least consider seeking the death penalty in this individual defendant's case  is fundamentally incompatible with both this expressed view and the over-all statutory scheme. Since the statute prescribes no particular criteria or methodology for making the CPL 250.40 choice, the Governor's insistence on case-specific factors instead of borough- or county-wide considerations cannot be justified as simple, lawful effort to "take care that the laws are faithfully executed" (NY Const, art IV, § 3). Similarly, the majority's assumption that the Bronx District Attorney's supposed "blanket policy" represents a refusal to exercise discretion stems from an overly constricted *231 view of the discretion that CPL 250.40 contemplates. A decision based on overriding policy considerations is as much an exercise of prosecutorial discretion as is one based on individualized factors (see, People v Bratton, 65 N.Y.2d 675, affg 103 AD2d 368 [approving District Attorney's office-wide policy to refrain from indicting absent defendant as a reasonable way to conserve prosecutorial resources]).
Moreover, given the unusual characteristics of death penalty prosecutions, it is difficult to believe that the Legislature would have approved the type of gubernatorial oversight of CPL 250.40 decisions that the Governor now advocates. It has been observed that the expected cost of prosecuting a death penalty case easily exceeds half a million dollars (see, Wise, Prosecutors Want Death Penalty; Qualms Voiced About Costs, Time, Training of Lawyers, NYLJ, Mar. 3, 1995, at 1, col 5, at 12, col 2 [citing remarks of Honorable Howard Relin, Dist Atty, Monroe County]). The Tioga County District Attorney has stated that "there is no way a small rural county with limited resources can now try homicide cases" (id., at 12, col 3). Even an urban District Attorney has been quoted as stating that the death penalty could be a "`major impediment to law enforcement, because of the cost, time spent and diversion of resources' away from prosecution of other crimes" (id., at 1, col 6 [citing remarks of Honorable Robert M. Morgenthau, Dist Atty, NY County]). Given the differences in the various counties' fiscal resources, their law enforcement priorities, and even the basic values and experiences of their constituent communities, it is unlikely that the Legislature contemplated a system in which the Governor would be free to intervene whenever he disagrees with a local District Attorney's policy choice to avoid the use of the death penalty. It is far more plausible to assume that the Legislature meant for the remedy, if any, for ill-advised CPL 250.40 decisions to come from the electorate.
With regard to the Governor's expressed concern about the risk of disparities and disproportionate results arising from policy choices such as those made by the District Attorney in this case, it should be observed that the scope and meaning of the statute's proportionality requirements  as well as their constitutional implications  have yet to be defined by this Court. Thus, the Governor's concern is, at best, premature. In any event, to the extent that localized decision-making may lead to disparities in the imposition of the death penalty, the problem is one that inheres in the legislation itself, and it cannot be remedied by the Governor's intervention on a case-by-case *232 basis. Indeed, such ad hoc intervention could well produce statistical imbalances and might therefore ultimately do more harm than good.
In the final analysis, it is simply too early in this State's fledgling experiment with the death penalty to even have a meaningful discussion about the administrative pitfalls that may lead to a proportionality problem. With that consideration subtracted, the Governor's supersession order can only be seen as a naked attempt to substitute his policy choices and those of the State Attorney-General for the preferences of the elected District Attorney. Since, in my view, that use of the supersession powers conferred by Executive Law § 63 contravenes the Legislature's intentions with regard to the over-all administration of death penalty prosecutions in the State, I would reverse the order of the Appellate Division and hold that the Governor exceeded his authority when he replaced the Bronx County District Attorney with the Attorney-General in the Diaz prosecution.
SMITH, J. (dissenting).
Since this action is moot, the appeal should be dismissed and the orders of the Appellate Division and Supreme Court should be vacated. While I believe the merits should not be reached, I address them only because the majority has chosen to do so. In that respect, the issue is not whether a Governor can supersede a District Attorney in a proper case. It is clear that he can. Rather, the issue is whether the Governor properly superseded the District Attorney in this case. I believe that he did not. First, I cannot agree that supersession is proper here without setting forth the limits of the Governor's authority to supersede. Second, supersession here threatens the carefully crafted legislative scheme which confers upon District Attorneys discretion to seek the death penalty.

I.
On March 7, 1995, the New York Legislature enacted a comprehensive set of statutes setting forth, among other things, sentencing options for a defendant convicted of murder in the first degree. The law provided that a court may impose a sentence of life imprisonment without parole, or a term of imprisonment for a class A-I felony other than a sentence of life imprisonment without parole, or death (see, Penal Law § 60.06). However, before the court may sentence a defendant *233 to death, the People must "file with the court and serve upon the defendant a notice of intent to seek the death penalty" and such notice must be filed within 120 days of the defendant's arraignment (CPL 250.40 [1], [2]). The law took effect in September 1995.
The very same day the legislation was signed into law by the Governor, the Bronx County District Attorney issued a press release purporting to "make [his] policy clear regarding the exercise of [his] discretion" to impose the death penalty. In this statement, the District Attorney expressed deeply felt concerns regarding the effectiveness and administration of the death penalty. He concluded by stating, "For all these reasons, while I will exercise my discretion to aggressively pursue life without parole in every appropriate case, it is my present intention not to utilize the death penalty provisions of the statute." On November 2, 1995, the District Attorney was reelected by approximately 89% of Bronx County citizens who voted.
In December 1995, a multiple homicide occurred in a Bronx shoe store and on or about December 19th, a defendant was accused of and later indicted for those killings. The following day, the Governor communicated, by letter, with the District Attorney "to inquire whether you have determined not to seek the death penalty and, if so, whether that determination was based on a review of the specific facts in the exercise of your professional discretion or reflects a policy decision not to seek the death penalty in any case in Bronx County." A response was requested by 5:30 P.M. that day. The District Attorney responded within the appointed time and stated:
"I am familiar with Chapter 1 of the Laws of 1995, governing the death penalty and I have reviewed the facts and circumstances surrounding this incident. Pursuant to that review, I intend to meet my constitutional and professional responsibility to hold this defendant accountable, punish him severely, and protect society. This I will do by exercising my statutory discretion to seek a term of incarceration of life imprisonment without the possibility of parole."
The Governor responded that he was "concerned that the laws of the State of New York may not be [faithfully] executed" and stated that, although, in his view, "the heinous murders allegedly committed by [the defendant] cry out for presenting the death penalty as an option to the jury for decision, *234 I accept with grave reservations your representation as to your professional decision in this instance."
Thereafter, on March 14, 1996, New York City Police Officer Kevin Gillespie was murdered in a shootout on the Grand Concourse in Bronx County. On March 19, 1996, the Governor again wrote to the Bronx County District Attorney expressing his view that "the facts developed to date have indicated that the case is one in which the death penalty seems particularly warranted: the crime was cold-blooded, and the alleged murderer has three prior felony convictions, two for violent crimes, and was involved in yet another robbery spree when he ruthlessly took Officer Gillespie's life." He stated that:
"As Governor, I cannot permit any District Attorney's personal opposition to a law to stand in the way of its enforcement. No one, including a District Attorney, can substitute his or her sense of right and wrong for that of the Legislature. For that reason, I must have your assurance that you do not have a policy against seeking the death penalty. In addition, because of both your public statements in opposition to the death penalty and your refusal to answer the question in December, I must ask the following question: `Are there circumstances under which you will seek the death penalty in Bronx County?'"
District Attorney Johnson responded, again within the appointed time:
"[L]et's be clear about what I have said about the option to seek death. I have not taken a `position in opposition to the death penalty.' Rather, I have enumerated concerns highlighted by personal experiences about the use and application of this option. And, as you certainly know, my original statement  made over a year ago, repeated many times since and still unchanged  left the door ajar, however slight, to exercise this option in the Bronx."
The District Attorney did not state whether he would pursue the death penalty as a sentencing option in the case. However, he noted that he had 120 days in which to make this determination.
The next day, the Governor issued Executive Order No. 27 (9 NYCRR 5.27) directing the Attorney-General to supersede the *235 Bronx District Attorney in the investigation of Officer Gillespie's murder. The order outlined the Governor's concerns that the District Attorney would never seek the death penalty as a sentencing option, thereby violating the law of New York. The order stated that such a "policy" "threatens the validity of death sentences imposed in cases prosecuted in other counties, because chapter 1 of the Laws of 1995 requires the Court of Appeals to determine whether a sentence of death is excessive or disproportionate to the penalty imposed in similar cases." The order also stated that the circumstances "strongly indicat[ed] that the case is one in which the death penalty is particularly warranted." On these grounds, the order concluded, supersession was warranted.
The District Attorney and members of the Bronx County electorate challenged the Executive Order and sought orders compelling the Governor to refrain from enforcing Executive Order No. 27, prohibiting the Attorney-General from acting under the Executive Order, and declaring the Executive Order unconstitutional. On July 18, 1996, Supreme Court dismissed the petitions. It reasoned that since supersession was authorized by statute, and the statute placed no limitations on the Governor, no justiciable controversy was presented. On March 20, 1997, the Appellate Division affirmed on substantially the same grounds. The court held that petitioners had failed to demonstrate that the Governor acted without authority and, thus, had failed to meet the threshold test of justiciability. District Attorney Johnson appealed as of right to this Court pursuant to CPLR 5601 (b) (1).

II.
This case is clearly moot. The mootness doctrine governs an action where the rights of the parties are not "directly affected by the determination of the appeal" or where the court's adjudication will have no legal impact on the parties (see, Matter of Hearst Corp. v Clyne, 50 N.Y.2d 707, 714; Delavan v New York, New Haven & Hartford R. R. Co., 216 N.Y. 359, 362). This doctrine, "which forbids courts to pass on academic, hypothetical, moot, or otherwise abstract questions, is founded both in constitutional separation-of-powers doctrine, and in methodological strictures which inhere in the decisional process of a common-law judiciary" (Matter of Hearst Corp. v Clyne, supra, at 713-714).
First, prior to trial, the sole defendant charged with murder in the first degree committed suicide and any prosecution was, *236 therefore, abated (see, Matter of Wexler v Lieberman, 78 N.Y.2d 990; Matter of Storar, 52 N.Y.2d 363, 369-370). Any argument that the case is not moot because some unspecified charges may still be brought by the District Attorney against codefendants who were not charged with murder in the first degree[1] or because the District Attorney may some day initiate other proceedings against unknown persons, is speculative and does not detract from a finding of mootness. Similarly, a request for payment of charges incurred by the Attorney-General has not been asserted against Bronx County nor is it presently clear that it will ever be. Additionally, it has not been demonstrated that remuneration of these charges is an essential part of the issues litigated on this appeal. Thus, the possibility that some unspecified expenses may be imposed upon Bronx County is ancillary, not independently significant, and insufficient to change the mootness factor.
Second, it is uncontroverted that the primary issue on appeal, the crux of this matter, revolves around the legitimacy of the Governor's exercise of power against the Bronx District Attorney through Executive Law § 63 (2) where such supersession culminated in the Attorney-General's declaration of an intent to impose the death penalty against defendant Diaz. But this issue is no longer present before this Court.[2] The supersession power of Executive Law § 63 (2) can no longer serve, in this case, as a vehicle to enforce the death penalty laws because the defendant upon whom the penalty could have been imposed has committed suicide. We are not asked to adjudge the general exercise of power under Executive Law § 63 (2), but rather *237 to examine its assertion within the context of the intent to enforce the death penalty. Thus, given the rather particular posture of this case, there is no live question before this Court.
The exceptions to the mootness doctrine articulated in Matter of Hearst Corp. v Clyne (supra) are not applicable in this appeal. There, we held that in order to be so excepted, the issue must be one that is likely to recur, that will typically evade review, and that presents a weighty or important question not previously explored (see, id., at 714-715). These three elements have not been met here.[3] Though acknowledging the significance of the issues arising from this case, there is no evidence or indication that the issues here presented are likely to recur between the instant parties or any others. One may reasonably recognize that given the display of executive authority manifested by appellant's removal, not one of the remaining District Attorneys has or is likely to set upon a similar course to draw the Governor's attention or invite him to employ again the superseder statute. Finally, it is demonstrably obvious that the issues presented are not of a character to evade review. There are no time constraints or other exigencies which might interfere with a court's treatment of the issues should they rise again. The death, by suicide or otherwise, of an incarcerated defendant who may receive a sentence of death is not claimed to be a common occurrence. Thus, the exception to the mootness doctrine does not revive the claim and the appeal should properly be dismissed.

III.
The primary issue before this Court is whether the Governor may, pursuant to his constitutional obligation to "take care that the laws are faithfully executed" (NY Const, art IV, § 3; Executive Law § 63 [2]), remove the District Attorney of Bronx *238 County from the prosecution of the alleged murderer of a police officer on the basis of the Governor's belief that the Bronx District Attorney has declared a "policy" not to seek the death penalty. The Governor essentially argues that his decision to remove or supersede the District Attorney is not only authorized by law, but this exercise of power is also unconstrained. He argues that Executive Law § 63 (2) confers upon him unfettered discretion to supersede a District Attorney in any circumstance he deems appropriate. I cannot agree.
This Court has recognized a Governor's power, through Executive Law § 63 (2), to supersede a District Attorney of this State (see, e.g., Mulroy v Carey, 58 AD2d 207, affd 43 N.Y.2d 819; Matter of Haggerty v Himelein, 89 N.Y.2d 431, 436; Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 N.Y.2d 14, 16). However, such statutory authority does not bar this Court from examining whether the individual has exceeded his authority or whether the executive's actions are incompatible with the legislative will. The breadth of the executive power notwithstanding, constitutional limits may be placed upon the executive branch. We have previously stated that
"[w]here power is delegated to one person, the power is always guided and limited by standards. In fact, even the Legislature is powerless to delegate the legislative function unless it provides adequate standards [citation omitted]. Without such standards there is no government of law, but only government by men left to set their own standards, with resultant authoritarian possibilities" (Rapp v Carey, 44 N.Y.2d 157, 162).
Indeed, with respect to Executive Law § 63 (2), we explicitly left open the question whether the exercise of executive power to supersede a District Attorney was beyond review or correction in any or all circumstances (see, Mulroy v Carey, 43 N.Y.2d 819, 821). Since that time, no holding of this Court has altered our statement in Mulroy v Carey (supra), and the question remains unanswered.
Given the majority's decision to reach the merits, this dispute presents the Court with the opportunity to address the question raised in Mulroy: whether a Governor has unfettered and unreviewable discretion to supersede a District Attorney and, if not, by what standard will his actions be adjudicated? While the majority does not address this question, an exercise of the *239 superseder power inferred in Executive Law § 63 (2) may be scrutinized by this Court and could be adjudged under an objective "rational basis" standard.
The requirement that there exist a rational basis (see, e.g., Matter of Di Brizzi, 303 N.Y. 206, 216 [suggesting "a reasonable relation" standard]; Matter of Turecamo Contr. Co., 260 App Div 253, 258 [supersession appropriate where District Attorney's conduct "is reasonably called in question"]) between the Governor's action and the valid discharge of the executive function also gives proper and necessary regard to the changed role of District Attorneys in this State. More than a century ago, District Attorneys of this State were appointed by the Governor (People v Kramer, 33 Misc 209, 214) while the Attorney-General possessed plenary power to prosecute crimes (id.) and was assisted in doing so by the District Attorney (People v Tru-Sport Publ. Co., 160 Misc 628, 637-639). Today, a District Attorney, though a member of the executive branch (People v Leahy, 72 N.Y.2d 510, 513), is also an elected constitutional officer (NY Const, art XIII, § 13), answerable to the people of his or her county. We have stated that "the essence of a District Attorney's constitutional, statutory and common-law prosecutorial authority is the `discretionary power to determine whom, whether and how to prosecute [a criminal] matter' [citation omitted], the responsibility and accountability for which is not freely transferable to anyone else, and that includes the Attorney-General" (Matter of Haggerty v Himelein, 89 N.Y.2d 431, 436).
The "rational basis" standard plainly does not place an onerous burden on the executive's ability to supersede. However, careful and deliberate scrutiny of that act is warranted in the context of the capital statute. As fully discussed below, because the Bronx District Attorney would be acting within the parameters articulated by the capital statute in opting to seek a sentence of life without parole, the "rational basis" standard has not been met.

IV.
Supersession of the Bronx District Attorney is invalid because the Governor's Executive Order does more than remove a District Attorney from a possible capital murder case. Rather, it so reformulates the carefully crafted and nuanced Murder One statute that it has effectively, and unconstitutionally, ventured into the domain of the Legislature.
Under this Court's articulation of the constitutional principle of separation of powers, it is the Legislature which "make[s] *240 the critical policy decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 N.Y.2d 781, 784). While great latitude is given the Executive in determining the mode and manner of enforcement (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 N.Y.2d 344), the Executive may not act inconsistently with the policy of the Legislature. When the Governor supersedes the Bronx District Attorney because that individual has purportedly failed to categorically state that he will, in some future instance, seek to impose the death penalty, the Governor has gone beyond what the Murder One statute requires and has, in a subtle but fundamental way, shifted the mandate of the Legislature.
In reviving the death penalty in New York,[4] the Legislature tread carefully and thoughtfully to articulate the process and manner in which life would be weighed and death imposed. It has attempted to respond to and anticipate any constitutional defect or challenge. The Legislature specified the relevant actors and entities and defined their roles in the process culminating, possibly, in the execution of a convicted defendant. It is within this context that the Governor's exercise of supersession must be examined and evaluated here.
In crafting the new death penalty provisions, the Legislature chose to bestow upon each one of the 62 District Attorneys of this State absolute discretion to seek either the penalty of death against a defendant accused of committing first-degree murder or life imprisonment without parole (see, e.g., Gregg v Georgia, 428 US 153, 197-200 [discussing prosecutorial discretion in death penalty context]). Fully cognizant of the consequences of this choice, the Legislature still empowered the District Attorneys to make the choice of sentencing options, *241 and gave scant guidance and placed no limitation on the manner in which this gravest of decisions would be made.[5]
Thus, it is evident that supersession, under authority of Executive Order No. 27, does more than undermine and constrain the exercise of that statutory discretion; supersession nullifies it. In this instance, Executive Law § 63 (2) is a vehicle used to scrutinize and evaluate the District Attorney's choice of sentencing options and, when found wanting, to simply void that decision. And after doing so, the Governor places upon himself, through the appointment of the Attorney-General, the mantle of authority to seek the death penalty. Such actions are unsustainable.
Supersession here undermines and effectively nullifies the legislative policy to give prosecutors, as representatives of the People, the discretion to seek the ultimate penalty. If prosecutorial discretion, in the context of the death penalty, is too expansive or inappropriately allows for the interference of individual passions, prejudices or philosophies, it is for the Legislature, not the Governor, to curtail that discretion. Whatever evils may flow from the exercise of unfettered discretion in the decision-making process, they are not addressed or remedied by the self-appointed transfer of discretion from one individual to another. If sustained in this context, supersession becomes an avenue to bypass the legislative scheme, within which the District Attorney is a key actor, and to supplant the legislative policy by giving that discretion to the Attorney-General. This is particularly true, and is constitutionally suspect, when the party from whom discretion is removed was granted that discretion by the Legislature.
Additionally, the Governor stated that the speed within which the Bronx District Attorney decided not to seek the *242 death penalty demonstrated that the District Attorney failed to engage in a reasoned, case-by-case evaluation and, as such, necessitated the Governor's intervention. This argument is not supportable. First, as stated previously, this "evaluation" by the Governor nullifies the statutory grant of discretion given to District Attorneys. Second, in this exacting, carefully crafted legislation which reinstates the death penalty, there is no language requiring a District Attorney to engage in any particular decision-making process before stating his or her intention with respect to the death penalty. In fact, while the statute provides that each District Attorney has 120 days in which to file a notice to seek the death penalty and he or she may decide to withdraw that notice whenever appropriate, the legislative history also demonstrates that:
"[a] prosecutor may determine at any time that the death penalty will not be sought in a particular case. Thus, a prosecutor may determine immediately following a charge that the death penalty will not be sought or may make such a determination at any stage of a prosecution thereafter. In such cases, as described in subdivision one of Section 400.27 of the Criminal Procedure Law, a prosecutor may seek a sentence of life without parole" (Mem of Assembly Codes Comm, 1995 NY Legis Ann, at 1, 4 [emphasis added]).
Thus, the timing of a District Attorney's articulation of his or her statutory right of discretion to seek the death penalty is of no moment and does not support the Governor's supersession here.
Finally, the Governor's intervention and supersession in this case is inconsistent with the language and policy of the capital statute because it implicitly, if not explicitly, suggests that in the face of certain crimes, the death penalty is the more appropriate penalty. But nowhere in its text or history does the statute require that such a penalty be sought or imposed. As one sponsor stated, the law "allows imposition of the death penalty in certain instances" (Mem of Assembly Member Vitaliano, at 1, Bill Jacket, L 1995, ch 1), it does not mandate it. The capital statute does not create or suggest a hierarchy within the sentencing options; the sentence of death was not denominated a more just or optimal sentence. To the contrary, the statute's sponsors stated that "[l]ike the death penalty, [life imprisonment without parole] is a more severe sentence than *243 any currently provided under the penal law. It should thus be reserved for the most heinous crimes and the most hardened offenders" (Mem of Assembly Codes Comm, 1995 NY Legis Ann, at 1, 5).[6]

V.
In sum, I conclude that this appeal is moot and should be dismissed and the orders below vacated. However, on the merits, I would reverse because the Governor's supersession has no rational basis because it undermines the legislative scheme granting District Attorneys the discretion to choose, or not to choose, the penalty of death.
In each case: Order affirmed, without costs.
NOTES
[1] We have no cause to doubt the District Attorney's own argument that the case is not moot because of several additional steps he could take if the superseder were found invalid, and therefore cannot agree with the dissent that such an argument is "speculative" (Smith dissenting opn, at 236). That the spectre of expenses chargeable to Bronx County by the Attorney-General is not "independently significant" (id.) similarly does not determine mootness. Those costs remain a live issue. Given this record, we need not and do not reach the exception to the mootness doctrine, which the Appellate Division found applicable even if the case were moot.
[2] This Court has rejected appellants' argument that Executive Law § 63 (2) should be read narrowly, as merely defining the general duties of the Attorney-General (see, e.g., Matter of Haggerty v Himelein, 89 N.Y.2d 431, 436; Mulroy v Carey, 43 NY2d at 821, supra; Matter of Dondi v Jones, 40 N.Y.2d 8, 19; People v Rallo, 39 N.Y.2d 217, 224).
[3] While the dissent speaks of discretion of the District Attorney, in point of fact the Criminal Procedure Law vests ultimate discretion to seek the death penalty in "the people," a class of representatives that includes the Attorney-General (CPL 250.40, 400.27; see also, CPL 1.20 [31], [32]).
[4] As the Memorandum of the Assembly Codes Committee points out, "District attorneys who must prosecute death penalty cases face unique challenges and must allocate additional resources in a capital case. In recognition of these burdens, [the death penalty] legislation provides a range of assistance programs for prosecutors litigating first degree murder cases" (1995 NY Legis Ann, at 1, 14). In addition to section 63-d, the Legislature enacted Executive Law § 837-a (7), which provides prosecutors with "continuing legal education, training, advice and assistance" in death penalty cases, and Executive Law § 837-l, which provides monies to District Attorneys financially burdened by capital prosecutions.
[1] The two codefendants, Ricardo Morales and Jesus Mendez, were indicted in Bronx County of murder in the second degree and related offenses in connection with the death of Officer Gillespie. However, Mendez and Morales were later tried in Federal court and convicted of violating the Racketeer Influenced and Corrupt Organizations statute (18 USC § 1962 [c]) under an indictment which explicitly included the murder of Officer Gillespie. Defendant Mendez was sentenced by the Federal court to a term of life plus 125 years and defendant Morales received a sentence of life imprisonment plus 105 years. On August 26, 1997, Supreme Court, Bronx County, with the consent of the People, dismissed the indictment against both defendants. Based on these facts, the Attorney-General argues that this case is moot. The Attorney-General recognizes, and has stated, that with the dismissal of the indictment, the relief sought by the District Attorney would have no effect on the parties.
[2] Several months after superseding the Bronx District Attorney and appearing in the case pursuant to the Governor's Executive Order No. 27, the Attorney-General declared his intention to seek the death penalty against defendant Diaz.
[3] The three elements described above constitute the exception to the mootness doctrine. Each element is not, separately, an exception to the mootness doctrine. Thus, in order to find that an issue should be excepted from the mootness doctrine it must be demonstrated that all three elements apply in the action (see, e.g., Matter of Chenier v Richard W., 82 N.Y.2d 830, 832 [stating that appeal may be retained if it satisfies "the three critical conditions to the mootness exception"]). Thus, while the existence of one element of the mootness exception may be demonstrated, if the others are not also met, the exception is not triggered or applicable (see, e.g., Matter of Hearst Corp. v Clyne, supra, at 715 [acknowledging the existence in the case of one element of the mootness exception, namely, the possibility that the issue may escape review, but still holding that the issue should not "be preserved as an exception to the mootness doctrine"]).
[4] Capital punishment, by means of the electric chair, was instituted in New York in 1888. The Nation's first electrocution took place in New York in 1890. Beginning in 1973 through 1984, this Court struck down various capital statutes due to constitutional defects (see, People v Fitzpatrick, 32 N.Y.2d 499, cert denied 414 US 1033; People v Davis, 43 N.Y.2d 17, cert denied 435 US 998; People v Smith, 63 N.Y.2d 41, cert denied 469 US 1227). From 1978 to 1994, Governors Carey and Cuomo vetoed all death penalty bills passed by the Legislature (see generally, Acker, New York's Proposed Death Penalty Legislation: Constitutional and Policy Perspectives, 54 Alb L Rev 515; Lumer and Tenney, The Death Penalty in New York: An Historical Perspective, 4 J L & Pol'y 81).
[5] It should be noted that when the Legislature envisioned the participation or assistance of the Attorney-General and Governor in the prosecution or appeal of a death penalty case, it did so only upon the request of the District Attorney. Specifically, Executive Law § 63-d (1) provides "The attorney-general shall, whenever required by the governor or his designee after a request of the governor by a district attorney, direct that the resources and personnel of the department of law be used to provide assistance relating to the prosecution or appeal of any case where the defendant may be subject to the penalty of death." Thus, a District Attorney can request assistance from a Governor in a death penalty case. This does not mean that, in the absence of a request, a Governor may supersede the District Attorney. Executive Law § 63-d provides only that assistance by the Attorney-General may be given to a District Attorney upon request of the District Attorney to the Governor.
[6] Thus, a District Attorney cannot be said to have ignored or failed to abide by the law by choosing one of the options given to him or her by the Legislature. In this particular case, the Governor believed that the Bronx District Attorney had a "blanket policy" against the death penalty and would never seek its imposition. The Bronx District Attorney has denied the existence of such a "blanket policy" and asserts that the door has been left open, however slightly, to the imposition of the death penalty. Again, the statute does not require a District Attorney to seek death. The Bronx District Attorney complied with the statute.