THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* TRU-SPORT PUBLISHING COMPANY, INC., JOSEPH RIFICI, SAMUEL ROSENTHAL, RUTH MILLER, FRANK PIDALA, SAMUEL SABO, ALFIO RIFICI, FRITZ ARNESON, ROSE ROSENTHAL, Defendants.

Supreme Court, Saratoga County, January 3, 1936.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General,* and *Sharon J. Mauhs, Assistant Attorney-General,* of counsel], and *John B. Smith, District Attorney,* for the plaintiff.

*Lester W. Block,* for the defendants.

BREWSTER, J. Defendants move to set aside six indictments presented against them on December 2, 1935, and numbered 355 to 360, inclusive, upon the ground that, in violation of subdivision 2 of section 313 of the Code of Criminal Procedure, a person was permitted to be present during the session of the grand jury while the charges embraced in the indictment were under consideration except as provided in sections 262, 263 and 264 of said Code, to wit, an Assistant Attorney-General of the State.

Indictments Nos. 355 to 357, inclusive, charge the defendants with violations of section 421 and the others charge them with violations of subdivisions 1 and 4 of section 580 of the Penal Law, all of the charges being indictable misdemeanors. Expressing it generally, it is charged that by publishing, circulating and placing before the public certain advertisements containing untrue, deceptive and misleading representations and statements of fact, the defendants violated section 421, and that, by conspiring so to do and also to thereby cheat and defraud members of the public generally out of money and property by criminal means, they infracted subdivisions 1 and 4 of section 580 of the Penal Law. All of the acts which are the foundation of such accusations had to do with the dissemination of certain allegedly false and misleading information and statements pertaining to the advertisers' ability and willingness to predict, and his or their accuracy in having predicted regarding the outcome of certain horse races together with a solicitation to make such future predictions for a money consideration.

It is freely admitted that the Attorney-General, by his duly appointed and qualified assistant, appeared before the grand jury which found these indictments and assisted in making the presentments upon which they were based. To the challenges made by these motions the People first answer for the authority of the Attorney-General in having so appeared, with a letter from the Secretary of State, dated August 14, 1935. The body of this is as follows:

"My dear ATTORNEY-GENERAL :

"I have before me your letter of August 7th, 1935, relative to the complaints received by both your office and the Racing Commission against the operators of various so-called race-track services which, as you say, have been inserting false and fraudulent advertisements in the racing papers published in New York.

"I also note that you have already conducted an investigation into the activities of these so-called racing services and that your investigation has disclosed that Sections 421 and 580 of the Penal Law of the State of New York have been violated and that a large number of citizens of this State has been defrauded.

" The Racing Commission, which is a division of the Department of State, in its letter to you of August 6th, 1935, has asked that you continue the investigation and prosecute every person in any way connected therewith in violation of the laws of this State.

" Pursuant to Section 62, subdivision 3 of the Executive Law of the State of New York, I request you to investigate all complaints and charges, as outlined in your letter and that of Chairman Swope, and to prosecute any and all persons therein who have acted in violation of the laws of this State."

The Executive Law, section 62, subdivision 3, is as follows:

" § 62. General duties. The Attorney-General shall: * * *

" 3. Upon the request of the Governor, Secretary of State, Comptroller, Superintendent of Public Works or Commissioner of Taxation and Finance, prosecute every person charged by either of them with the commission of an indictable offense of the laws, which such officer is specially required to execute, or in relation to matters connected with his department."

The first question, then, is whether the offenses charged in these indictments were, (a) in violation of the laws which the Secretary of State " is specially required to execute," or, (b) in violation of the laws " in relation to matters connected with his department."

I do not understand that the People place any reliance upon the first part of the above inquiry which must, of course, be answered in the negative since there cannot be found in the statutes or elsewhere any " special requirement " for the Secretary of State or any of the divisions in the Department of State to execute the statutes in question.

As to the second part of this inquiry, it has been argued, in substance, that since the offenses aimed at by the prosecution arose from or as a result of the conduct of horse races at meetings over which a division in the Department of State, viz., the State Racing Commission, had certain general power and supervision (Laws of 1926, chap. 440, §§ 6, 6-a, 7, 8, as amd.), accordingly such offenses, although interdicted only by the general statute, nevertheless concern and are in relation to matters connected with that department.

Any such relation to matters that are of the Department of State must, therefore, be found, if at all, in the relation of the offenses charged to matters and things as to which the State Racing Commission has, either specifically or generally, something to do, or concerning or over which it has some power, supervision or duty.

In the enumeration of the powers and duties of such body I am unable to find anything of this sort. That body is clothed with general powers in relation to certain matters permitted to certain corporations formed under said act, " for raising, and breeding and improving the breed of horses." (Laws of 1926, chap. 440, as amd.) I find no duties or powers in the Commission that concern or relate to abuses or offenses against the Penal Law that arise or occur away from the places where the race meetings are held under the law which they administer. The Commission's functions have to do directly with the holding of the race meetings and I feel it would be going too far to hold that because offenses against the Penal Law are committed in divers and sundry parts of the State away from the places where the race meetings are held and which are wholly disconnected with their actual conduct, and committed by persons having no lawful concern therewith save as members of the general public, that such offenses may be held to be violations of law that are in relation to those matters and things that have, by said statute, been committed to the State Racing Commission and thus to the Department of State. The law does give the Racing Commission "power to supervise generally race meetings," but I find no power which they may exercise over acts of members of the public away from and off the grounds of the place of such meetings and which only concern incidents that arise from the fact that the races are held. Even though the law itself, viz., the particular statute violated, need have no direct, special or single relation to matters in charge of the Commission, still the acts constituting the violation must bear some such relationship. I do not find that they do. A remote relationship may be seen from the argument that the offenses charged, if not checked, may bring the subject-matter of legally ordained horse racing into such public disrepute as to injure its future existence and prove inimical to the interest of its legitimate conduct, and that thus the offenses charged do bear some relationship to the matters over which the Commission has some lawful concern. But I feel this connection is too remote and I find nothing in the statute which devolves upon the Commission any power or duty to thus foster the future continuance of racing or its interests, in so far as such may be affected by a changing public opinion. Furthermore, we are dealing with a somewhat technical phase of criminal procedure. Our ancient concern with procedural niceties in criminal prosecutions again confronts us We are now looking for *statutory* authority for the Attorney-General's appearance before the grand jury and I feel that in that search we may not substitute such

considerations even though they be morally suasive. Moreover, neither in the letter of request from the Secretary of State, *supra*, nor in the indictments themselves, does it appear that the complaints and charges therein referred to and contained bear any relation to matters connected with the Department of State. And the request itself, the very indicia of the title for the claimed statutory authority, is, it seems to me, insufficiently complete and definite as to the subject-matter of the requested prosecution and, as well, to its compass in time, place and manner. For aught that appears the prosecution requested might be a continuous one and occupy all the criminal forums of the State. Definition of line of investigation and proceeding and designation of forum must be manifested in the Governor's demand when such is to constitute the Attorney-General's authority to act in the cases referred to in subdivision 2 of section 62 of the Executive Law. (*People ex rel. Osborne* v. *Board of Supervisors of Westchester Co.*, 168 App. Div. 765.) It would, therefore, seem that such conditions must be held to also apply, at least generally, when a request is made under subdivision 3. The need of such particulars in the latter case is pointed out by the fact that under subdivision 2 the authority of the Attorney-General is not circumscribed as to subject-matter. It may concern anything in the Governor's demand. Whereas, under subdivision 3, the statute itself does limit the subject-matter as there stated. Furthermore, there is nothing on the face of the indictments to show that the offenses therein charged were the complaints specified in the Secretary of State's letter of request. (*People* v. *Welz*, 70 Misc. 183.) The statute (Executive Law, § 62, subd. 3) makes it the duty of the Attorney-General to prosecute persons who are charged with the offenses referred to, by the official there named, and it may well be questioned as to whether the persons under indictment were charged with such offenses by the Secretary of State within the fair meaning and intent of the statute. It may well be argued that the offenses referred to in said subdivision 3 are only such specific violations of the law as it became the special duty of the complaining officer to execute, or such a specific violation as definitely related to some matter connected with his department, and that, in any of such cases, such complaining officer, demanding the services of the Attorney-General, must reduce his complaint to a definite charge even though it need not comply with the formalities of the Code of Criminal Procedure.

Thus while the letter of the Secretary of State, *supra*, may constitute some color of authority, were it to stand alone as the only authority for the Attorney-General's appearance before the grand jury, I would feel constrained to grant the pending motions.

The answering affidavits, however, present another situation. They disclose that several months ago the Attorney-General took notice of many complaints from many citizens who asserted they had been defrauded by divers persons; that inquiry and investigation disclosed the existence of criminal practices such as are charged in these indictments and that they were so extensive and pernicious as to subject large portions of the general public to increasing dangers of financial loss, besides having accomplished that in the past; that the Attorney-General thereupon proceeded to act affirmatively and soon thereafter sought a forum for the inception of prosecutions. The criminal acts and effects thereof which were found and charged appear to have been of a kind and character that necessarily occurred in many different localities. They transcended county lines. Jurisdiction thus obtained in any county where those acts or the effects thereof which constituted or were requisite to the consummation of the offense occurred. (Code Crim. Proc. § 134.) Thus it appears he selected Saratoga county and the forum there for the prosecutions in question. In doing this, instead of turning the matter wholly over to the district attorney of that county, by agreement with that official and by an agreement of co-operation between them, they thereafter proceeded to the present status. This agreement of co-operation occurred before the beginning of the session of the grand jury at which these indictments were found. In thus working together it resulted that the Attorney-General, by his assistant, and at the request of the grand jury, attended before that body and assisted them in the examination of witnesses and in making the presentments to them. Must we now hold that such appearance of the Attorney-General's representative was so without warrant of law as to be fatal to the indictments?

Sections 262, 263 and 264 of the Code of Criminal Procedure do not forbid this questioned practice by any express prohibition. The origin of these sections date at least as far back as the Revised Statutes passed in 1827–28. Their substance has not been changed since. The amendments of recent years were occasioned by the enlarged personnel of the district attorneys' staffs in certain counties and a special statutory devolvement of duty upon the Attorney-General as regards crimes against the elective franchise. Their ancient prototypes perhaps more lucidly than their present content indicate their real purpose as being to insure the secrecy of grand jury deliberations. They indicate that that secrecy was to be continued and preserved and the members thus kept free to act and independent of any ulterior influence. The design here, of

course, was to insure impartial and just treatment and respect for both public and private rights. An analysis of these provisions of the Code discloses that this was their particular aim: (1) To afford grand jury due access to legal advice and to furnish them the means of securing assistance by way of legal services and advice from the public prosecutor (§§ 262, 263); and (2) to afford the latter opportunity of making presentments to them and to insure the secrecy of their ultimate action by excluding *everyone* from their presence during their expressions of opinion and the giving of the votes of its members upon any matter. (§ 264. See, also, Laws of 1881, chap. 442, §§ 262, 263 and 264, and R. S. pt. IV, chap. II, tit. 4, art. 1, §§ 32, 33.) It is evident that the present identically phrased title headings to these sections were no part of the legislative enactment. They seem to have been inherited from the marginal notations placed on the early enactments and it is patent that as now used they do not correctly express the true content of what they caption. It is noted in passing that in the enactment of the Revised Statutes of 1827–28, *supra*, the substance of what is now section 262 and some of section 263 bore the marginal notation, " District Attorney attending jury," and, as to section 33, the substance of which is now contained in section 264 and the rest of section 263, the marginal notation was, " Ib. deliberations to be private."

It is to be noted that there is no proof made nor, in fact, is there any clear claim asserted that any person was present with the grand jury when they took ultimate and final action on these indictments save the members themselves. These sections contain but one positive requirement as to the exclusion of persons before the grand jury and there is no evidence that such provision was violated, and, of course, no claim is made that the assistance rendered by the Attorney-General unduly or unlawfully influenced them. Considering the matter in this strict sense, a holding might be justified that no showing has been made that any person was present during the grand jury sessions while the charges embraced in these indictments were under consideration. The words, " under consideration," as used in subdivision 2 of section 313 of the Code of Criminal Procedure, which provides that an indictment " must be set aside  *  *  *  When a person has been permitted to be present during the session of the grand jury, while the charge embraced in the indictment was under consideration, except as provided in sections two hundred and sixty-two, two hundred and sixty-three, and two hundred and sixty-four," do not seem to have received any direct judicial construction in this State. Literally, it

denotes only that stage in the proceeding before the grand jury when no one at all may be present other than the members that compose that body. To consider a proposition of any kind means to think about it, to reflect upon or ponder it. The word "consideration," as used in this sense, is derived from the Latin *consido*, meaning to sit down and signifies "to make to settle." (Crabb's Eng. Syn. [ed. 1927] 229.) Literally the grand jury may not undertake the consideration of a given case until they have heard all the evidence, for not until then is the matter in form or shape for the consideration that is to influence particular action. (Crabb, *supra*, 229.) When the word is used in a different sense as applying to the hearing of evidence as it unfolds, we stretch its meaning, distort its real sense and do violence to its practical use as applied generally to judicial proceedings before trial juries and other tribunals. However, since it is the theory and policy of our criminal procedure that only the regularly constituted authorities upon whom the law devolves the power so to do, may officiate in aid of the grand jury, and since a strictly accurate definition of the word "consideration," as used in subdivision 2 of section 313 of the Criminal Code, would render meaningless the exception there pointed to, the other sections of said Code there referred to, I am of the opinion that this word must be held to refer to all the proceedings had in the grand jury room in so far as including the reception of evidence and the ultimate action upon it. As was stated by Recorder GOFF in *People* v. *Kramer* (33 Misc. 209, 211): " These three sections [Code Crim. Proc. §§ 262, 263 and 264], taken together, define the duties and right of the district attorney in his relation to the grand jury, and, when considered in connection with section 313, may be fairly held to intend that the performance of those duties and the exercise of that right are limited to that official, unless it be otherwise ordained by law."

Within their field of action the grand jury possess a plenary power. While the public prosecutor must hold himself available to them they are not obliged to accept his services. " They are not obliged to call in the district attorney but may vote to indict without his presence and indeed against his advice." (*People* v. *Grout*, 85 Misc. 570, 573.) On the other hand, they are bound to give him freedom of access to them for the purpose, as the statute says, " of giving information relative to any matter before them." Only in this latter event and for such purpose has he any right to appear before them except as they require it. (Code Crim. Proc. §§ 263, 264.)

This brings us to the question as to whether they could legally permit the assistance and appearance before them of the Attorney-

General and accept his services and advice when and while he was acting in concert and in co-operation with the district attorney.

This question directs us to an examination of the origin and functions of these two offices. There are two decisions which have done this sufficiently for such purpose here. In *People* v. *Kramer* (*supra*) the origin and history of the office of Attorney-General is quite fully treated and its functions set forth, and there, and also in *Spielman Motor Sales Co., Inc.,* v. *Dodge* (295 U. S. 89; 55 Sup. Ct. 678) the origin, history and status of the office of district attorney, in New York, is set forth at some length. The researches revealed in these opinions disclose that the office of Attorney-General existed at common law, and the incumbent had the power and duty of appearing in any matter or proceeding, civil or criminal, wherein the sovereign was interested. Thus he could and did attend the sittings of any grand jury and assist in presentments of criminal charges. All those powers and prerogatives were retained by that office upon its inauguration into the organization of our State government, and there they still exist along with the powers since granted to it, except only as they have been expressly abrogated by statutory enactment or by a reasonable intendment so to do necessarily implied from such enactment. As regards the power of the Attorney-General as the general public prosecutor and defender in all legal matters that concern the sovereign, he is still supreme in so far as any legislative enactments have expressly taken away or limited that power. No express shearing away of any of his ancient powers can be found. As early as 1796 (Laws of 1796, chap. 8) enactments began which relieved him from some of his duties by providing for the appointment of Assistant Attorneys-General in certain districts. It is significant and important to note that this act and similar subsequent enactments only relieved from certain duties and abstained from depriving of power. The rise of the office of district attorney is easily traceable as the outgrowth of these early offices of Assistant Attorneys-General. The growth of population and general development of settlement and industry throughout the far flung portions of the State may be seen as the underlying cause for the later rise and establishment of the office of district attorney, whose incumbent is still regarded as a State officer. (*Fellows* v. *Mayor*, 8 Hun, 484; *People* v. *Fuller*, 156 Misc. 404, 427.) In *Spielman Motor Sales Co., Inc.,* v. *Dodge* (*supra,* 55 Sup. Ct. at p. 679) Chief Justice HUGHES, in delivering the opinion of the court, stated:

" The office of district attorney in the State of New York was created in 1801. In each of the districts as then established, which

included several counties, he was charged with duties which previously had devolved upon an Assistant Attorney-General. In 1815 the county of New York was made a separate district, and in 1818 provision was made for the appointment of a district attorney in each county. The power of appointment was vested in the Governor and the Council of Appointment until the Constitution of 1821, when that power was given to the County Courts. The Constitution of 1846 provided that district attorneys should be chosen by the electors of the respective counties.

" Despite this provision for local elections, the district attorney in each county has been regarded as a State officer performing a State function and taking the place, in respect to his duties within the district or county, of the Attorney-General, upon whom at the outset these duties had been laid. Lincoln's Constitutional History of New York, vol. 2, pp. 529, 530; vol. 4, pp. 722, 723."

Thus, there is seen the close relationship these two offices bear to each other. The one having been derived from the other and possessing within a certain locality or political subdivision some of the duties that formerly devolved upon the other, and along with this historic development we find no express abrogation of the power, duty under which was relieved by the creation and development of the newer statutory office that was to operate in the restricted district. In *People* v. *Kramer* (*supra*, at pp. 218, 219) the conclusion there stated upon this existing relationship seems to me a sound one, viz.:

" The district attorney had no common law powers, like the sheriff, nor have the emoluments of his office been interfered with, as in the case of the county clerk. His office is derived from that of the Attorney-General, and, at its inception, he was designated as his assistant. By a succession of constitutional provisions and legislative enactments, the right of the Attorney-General to prosecute and conduct criminal actions, and to require the assistance of the district attorney in such cases, is declared and recognized. No one of his powers or duties has been abrogated by statute.

" The district attorney, by statute and by a long-continued practice, has succeeded to some of the powers of the Attorney-General within the respective counties, but he has not supplanted him."

We have here no question of prerogative as between the two offices in a case where the lesser had the express and prior duty of action. We have only the question of their right to co-operate in a given case and, by so doing, to share the prerogatives in a way agreeable to the incumbents and to the grand jury. In my opinion

the Attorney-General, under the circumstances disclosed, had the right and power to appear, assist and attend before the grand jury in aiding the making of the presentments to them, upon their request and willing receipt of such services, as fully appears to have been the case. Historically, the district attorney is an assistant to the Attorney-General and the line of their service is the same. The chief officer has been shorn of none of his ancient powers. The reasons that justify co-ordinate and co-operative action between the two offices on given occasions are many, and none are conceivable except such as are salutary to the enforcement of the law. The secrecy of the grand jury room and the protection of both public and private rights, these are in no way disturbed or violated by such co-operative action. In fact, they are thereby further insured. The cycle of problem that confronts the administration of our criminal law has turned to the point where the need of a renewal of the use of the Attorney-General's common-law power may be said to be oft times apparent. This is illustrated by the charges contained in these indictments. Criminal acts and organizations no longer have a localized aspect and such operations, more than ever before, transcend restricted fields in their mutiny against the law. Geographical bounds no longer bar the way to the criminal as they were wont to do in the nineteenth century, and cases are easily envisioned where a district attorney and the grand jury may sorely need such assistance in the interest of public justice. The nonuser of those powers during the past century has not, in my opinion, destroyed them. Custom alone has made for a routine of action that may give to the question here presented a novel aspect. There can be no sanctity in the absence of an express permission in the statute for the exercise of a power recognized by our law since time immemorial. Statutory enactments only relieved from the duty of its exercise when they gave a like power, coupled with a duty, to another. Custom and practice has doubtless made the latter duty paramount and accorded precedence in performance. Thus this power of the Attorney-General was rendered dormant for want of employment. Later enactments rearranged precedence when positive duty was assigned, coupled to the old power, and thereby the latter was expressly renewed for special causes. But through all of this transition, it is my opinion, the power itself was not destroyed though rendered latent. Therefore, in the cases here presented it seems to me that it was lawfully renewed and quickened by the action of the district attorney and the grand jury.

The motions are denied and orders may be submitted.