Smith, J.
(dissenting). Since this action is moot, the appeal should be dismissed and the orders of the Appellate Division and Supreme Court should be vacated. While I believe the merits should not be reached, I address them only because the majority has chosen to do so. In that respect, the issue is not whether a Governor can supersede a District Attorney in a proper case. It is clear that he can. Rather, the issue is whether the Governor properly superseded the District Attorney in this case. I believe that he did not. First, I cannot agree that supersession is proper here without setting forth the limits of the Governor’s authority to supersede. Second, supersession here threatens the carefully crafted legislative scheme which confers upon District Attorneys discretion to seek the death penalty.
I.
On March 7, 1995, the New York Legislature enacted a comprehensive set of statutes setting forth, among other things, sentencing options for a defendant convicted of murder in the first degree. The law provided that a court may impose a sentence of life imprisonment without parole, or a term of imprisonment for a class A-I felony other than a sentence of life imprisonment without parole, or death (see, Penal Law § 60.06). However, before the court may sentence a defendant *233 to death, the People must "file with the court and serve upon the defendant a notice of intent to seek the death penalty” and such notice must be filed within 120 days of the defendant’s arraignment (CPL 250.40 [1], [2]). The law took effect in September 1995.
The very same day the legislation was signed into law by the Governor, the Bronx County District Attorney issued a press release purporting to "make [his] policy clear regarding the exercise of [his] discretion” to impose the death penalty. In this statement, the District Attorney expressed deeply felt concerns regarding the effectiveness and administration of the death penalty. He concluded by stating, "For all these reasons, while I will exercise my discretion to aggressively pursue life without parole in every appropriate case, it is my present intention not to utilize the death penalty provisions of the statute.” On November 2, 1995, the District Attorney was reelected by approximately 89% of Bronx County citizens who voted.
In December 1995, a multiple homicide occurred in a Bronx shoe store and on or about December 19th, a defendant was accused of and later indicted for those killings. The following day, the Governor communicated, by letter, with the District Attorney "to inquire whether you have determined not to seek the death penalty and, if so, whether that determination was based on a review of the specific facts in the exercise of your professional discretion or reflects a policy decision not to seek the death penalty in any case in Bronx County.” A response was requested by 5:30 p.m. that day. The District Attorney responded within the appointed time and stated:
"I am familiar with Chapter 1 of the Laws of 1995, governing the death penalty and I have reviewed the facts and circumstances surrounding this incident. Pursuant to that review, I intend to meet my constitutional and professional responsibility to hold this defendant accountable, punish him severely, and protect society. This I will do by exercising my statutory discretion to seek a term of incarceration of life imprisonment without the possibility of parole.”
The Governor responded that he was "concerned that the laws of the State of New York may not be [faithfully] executed” and stated that, although, in his view, "the heinous murders allegedly committed by [the defendant] cry out for presenting the death penalty as an option to the jury for deci *234 sion, I accept with grave reservations your representation as to your professional decision in this instance.”
Thereafter, on March 14, 1996, New York City Police Officer Kevin Gillespie was murdered in a shootout on the Grand Concourse in Bronx County. On March 19, 1996, the Governor again wrote to the Bronx County District Attorney expressing his view that "the facts developed to date have indicated that the case is one in which the death penalty seems particularly warranted: the crime was cold-blooded, and the alleged murderer has three prior felony convictions, two for violent crimes, and was involved in yet another robbery spree when he ruthlessly took Officer Gillespie’s life.” He stated that:
"As Governor, I cannot permit any District Attorney’s personal opposition to a law to stand in the way of its enforcement. No one, including a District Attorney, can substitute his or her sense of right and wrong for that of the Legislature. For that reason, I must have your assurance that you do not have a policy against seeking the death penalty. In addition, because of both your public statements in opposition to the death penalty and your refusal to answer the question in December, I must ask the following question: 'Are there circumstances under which you will seek the death penalty in Bronx County?’ ”
District Attorney Johnson responded, again within the appointed time:
"[L]et’s be clear about what I have said about the option to seek death. I have not taken a 'position in opposition to the death penalty.’ Rather, I have enumerated concerns highlighted by personal experiences about the use and application of this option. And, as you certainly know, my original statement — made over a year ago, repeated many, times since and still unchanged — left the door ajar, however slight, to exercise this option in the Bronx.”
The District Attorney did not state whether he would pursue the death penalty as a sentencing option in the case. However, he noted that he had 120 days in which to make this determination.
The next day, the Governor issued Executive Order No. 27 (9 NYCRR 5.27) directing the Attorney-General to supersede the *235 Bronx District Attorney in the investigation of Officer Gillespie’s murder. The order outlined the Governor’s concerns that the District Attorney would never seek the death penalty as a sentencing option, thereby violating the law of New York. The order stated that such a "policy” "threatens the validity of death sentences imposed in cases prosecuted in other counties, because chapter 1 of the Laws of 1995 requires the Court of Appeals to determine whether a sentence of death is excessive or disproportionate to the penalty imposed in similar cases.” The order also stated that the circumstances "strongly indicat[ed] that the case is one in which the death penalty is particularly warranted.” On these grounds, the order concluded, supersession was warranted.
The District Attorney and members of the Bronx County electorate challenged the Executive Order and sought orders compelling the Governor to refrain from enforcing Executive Order No. 27, prohibiting the Attorney-General from acting under the Executive Order, and declaring the Executive Order unconstitutional. On July 18, 1996, Supreme Court dismissed the petitions. It reasoned that since supersession was authorized by statute, and the statute placed no limitations on the Governor, no justiciable controversy was presented. On March 20, 1997, the Appellate Division affirmed on substantially the same grounds. The court held that petitioners had failed to demonstrate that the Governor acted without authority and, thus, had failed to meet the threshold test of justiciability. District Attorney Johnson appealed as of right to this Court pursuant to CPLR 5601 (b) (1).
II.
This case is clearly moot. The mootness doctrine governs an action where the rights of the parties are not "directly affected by the determination of the appeal” or where the court’s adjudication will have no legal impact on the parties (see, Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714; Delavan v New York, New Haven & Hartford R. R. Co., 216 NY 359, 362). This doctrine, "which forbids courts to pass on academic, hypothetical, moot, or otherwise abstract questions, is founded both in constitutional separation-of-powers doctrine, and in methodological strictures which inhere in the decisional process of a common-law judiciary” (Matter of Hearst Corp. v Clyne, supra, at 713-714).
First, prior to trial, the sole defendant charged with murder in the first degree committed suicide and any prosecution was, *236 therefore, abated (see, Matter of Wexler v Lieberman, 78 NY2d 990; Matter of Storar, 52 NY2d 363, 369-370). Any argument that the case is not moot because some unspecified charges may still be brought by the District Attorney against codefendants who were not charged with murder in the first degree[1] or because the District Attorney may some day initiate other proceedings against unknown persons, is speculative and does not detract from a finding of mootness. Similarly, a request for payment of charges incurred by the Attorney-General has not been asserted against Bronx County nor is it presently clear that it will ever be. Additionally, it has not been demonstrated that remuneration of these charges is an essential part of the issues litigated on this appeal. Thus, the possibility that some unspecified expenses may be imposed upon Bronx County is ancillary, not independently significant, and insufficient to change the mootness factor.
Second, it is uncontroverted that the primary issue on appeal, the crux of this matter, revolves around the legitimacy of the Governor’s exercise of power against the Bronx District Attorney through Executive Law § 63 (2) where such supersession culminated in the Attorney-General’s declaration of an intent to impose the death penalty against defendant Diaz. But this issue is no longer present before this Court.[2] The supersession power of Executive Law § 63 (2) can no longer serve, in this case, as a vehicle to enforce the death penalty laws because the defendant upon whom the penalty could have been imposed has committed suicide. We are not asked to adjudge the general exercise of power under Executive Law § 63 (2), but rather *237 to examine its assertion within the context of the intent to enforce the death penalty. Thus, given the rather particular posture of this case, there is no live question before this Court.
The exceptions to the mootness doctrine articulated in Matter of Hearst Corp. v Clyne (supra) are not applicable in this appeal. There, we held that in order to be so excepted, the issue must be one that is likely to recur, that will typically evade review, and that presents a weighty or important question not previously explored (see, id., at 714-715). These three elements have not been met here.[3] Though acknowledging the significance of the issues arising from this case, there is no evidence or indication that the issues here presented are likely to recur between the instant parties or any others. One may reasonably recognize that given the display of executive authority manifested by appellant’s removal, not one of the remaining District Attorneys has or is likely to set upon a similar course to draw the Governor’s attention or invite him to employ again the superseder statute. Finally, it is demonstrably obvious that the issues presented are not of a character to evade review. There are no time constraints or other exigencies which might interfere with a court’s treatment of the issues should they rise again. The death, by suicide or otherwise, of an incarcerated defendant who may receive a sentence of death is not claimed to be a common occurrence. Thus, the exception to the mootness doctrine does not revive the claim and the appeal should properly be dismissed.
III.
The primary issue before this Court is whether the Governor may, pursuant to his constitutional obligation to "take care that the laws are faithfully executed” (NY Const, art IV, § 3; Executive Law § 63 [2]), remove the District Attorney of Bronx *238 County from the prosecution of the alleged murderer of a police officer on the basis of the Governor’s belief that the Bronx District Attorney has declared a "policy” not to seek the death penalty. The Governor essentially argues that his decision to remove or supersede the District Attorney is not only authorized by law, but this exercise of power is also unconstrained. He argues that Executive Law § 63 (2) confers upon him unfettered discretion to supersede a District Attorney in any circumstance he deems appropriate. I cannot agree.
This Court has recognized a Governor’s power, through Executive Law § 63 (2), to supersede a District Attorney of this State (see, e.g., Mulroy v Carey, 58 AD2d 207, affd 43 NY2d 819; Matter of Haggerty v Himelein, 89 NY2d 431, 436; Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 NY2d 14, 16). However, such statutory authority does not bar this Court from examining whether the individual has exceeded his authority or whether the executive’s actions are incompatible with the legislative will. The breadth of the executive power notwithstanding, constitutional limits may be placed upon the executive branch. We have previously stated that
"[w]here power is delegated to one person, the power is always guided and limited by standards. In fact, even the Legislature is powerless to delegate the legislative function unless it provides adequate standards [citation omitted]. Without such standards there is no government of law, but only government by men left to set their own standards, with resultant authoritarian possibilities” (Rapp v Carey, 44 NY2d 157, 162).
Indeed, with respect to Executive Law § 63 (2), we explicitly left open the question whether the exercise of executive power to supersede a District Attorney was beyond review or correction in any or all circumstances (see, Mulroy v Carey, 43 NY2d 819, 821). Since that time, no holding of this Court has altered our statement in Mulroy v Carey (supra), and the question remains unanswered.
Given the majority’s decision to reach the merits, this dispute presents the Court with the opportunity to address the question raised in Mulroy. whether a Governor has unfettered and unreviewable discretion to supersede a District Attorney and, if not, by what standard will his actions be adjudicated? While the majority does not address this question, an exercise of the *239 superseder power inferred in Executive Law § 63 (2) may be scrutinized by this Court and could be adjudged under an objective "rational basis” standard.
The requirement that there exist a rational basis (see, e.g., Matter of Di Brizzi, 303 NY 206, 216 [suggesting "a reasonable relation” standard]; Matter of Turecamo Contr. Co., 260 App Div 253, 258 [supersession appropriate where District Attorney’s conduct "is reasonably called in question”]) between the Governor’s action and the valid discharge of the executive function also gives proper and necessary regard to the changed role of District Attorneys in this State. More than a century ago, District Attorneys of this State were appointed by the Governor (People v Kramer, 33 Misc 209, 214) while the Attorney-General possessed plenary power to prosecute crimes (id.) and was assisted in doing so by the District Attorney (People v Tru-Sport Publ. Co., 160 Misc 628, 637-639). Today, a District Attorney, though a member of the executive branch (People v Leahy, 72 NY2d 510, 513), is also an elected constitutional officer (NY Const, art XIII, § 13), answerable to the people of his or her county. We have stated that "the essence of a District Attorney’s constitutional, statutory and common-law prosecutorial authority is the 'discretionary power to determine whom, whether and how to prosecute [a criminal] matter’ [citation omitted], the responsibility and accountability for which is not freely transferable to anyone else, and that includes the Attorney-General” (Matter of Haggerty v Himelein, 89 NY2d 431, 436).
The "rational basis” standard plainly does not place an onerous burden on the executive’s ability to supersede. However, careful and deliberate scrutiny of that act is warranted in the context of the capital statute. As fully discussed below, because the Bronx District Attorney would be acting within the parameters articulated by the capital statute in opting to seek a sentence of life without parole, the "rational basis” standard has not been met.
IV.
Supersession of the Bronx District Attorney is invalid because the Governor’s Executive Order does more than remove a District Attorney from a possible capital murder case. Rather, it so reformulates the carefully crafted and nuanced Murder One statute that it has effectively, and unconstitutionally, ventured into the domain of the Legislature.
Under this Court’s articulation of the constitutional principle of separation of powers, it is the Legislature which "make[s] *240 the critical policy decisions, while the executive branch’s responsibility is to implement those policies” (Bourquin v Cuomo, 85 NY2d 781, 784). While great latitude is given the Executive in determining the mode and manner of enforcement (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344), the Executive may not act inconsistently with the policy of the Legislature. When the Governor supersedes the Bronx District Attorney because that individual has purportedly failed to categorically state that he will, in some future instance, seek to impose the death penalty, the Governor has gone beyond what the Murder One statute requires and has, in a subtle but fundamental way, shifted the mandate of the Legislature.
In reviving the death penalty in New York,[4] the Legislature tread carefully and thoughtfully to articulate the process and manner in which life would be weighed and death imposed. It has attempted to respond to and anticipate any constitutional defect or challenge. The Legislature specified the relevant actors and entities and defined their roles in the process culminating, possibly, in the execution of a convicted defendant. It is within this context that the Governor’s exercise of supersession must be examined and evaluated here.
In crafting the new death penalty provisions, the Legislature chose to bestow upon each one of the 62 District Attorneys of this State absolute discretion to seek either the penalty of death against a defendant accused of committing first-degree murder or life imprisonment without parole (see, e.g., Gregg v Georgia, 428 US 153, 197-200 [discussing prosecutorial discretion in death penalty context]). Fully cognizant of the consequences of this choice, the Legislature still empowered the District Attorneys to make the choice of sentencing options, *241 and gave scant guidance and placed no limitation on the manner in which this gravest of decisions would be made.[5]
Thus, it is evident that supersession, under authority of Executive Order No. 27, does more than undermine and constrain the exercise of that statutory discretion; supersession nullifies it. In this instance, Executive Law § 63 (2) is a vehicle used to scrutinize and evaluate the District Attorney’s choice of sentencing options and, when found wanting, to simply void that decision. And after doing so, the Governor places upon himself, through the appointment of the Attorney-General, the mantle of authority to seek the death penalty. Such actions are unsustainable.
Supersession here undermines and effectively nullifies the legislative policy to give prosecutors, as representatives of the People, the discretion to seek the ultimate penalty. If prosecutorial discretion, in the context of the death penalty, is too expansive or inappropriately allows for the interference of individual passions, prejudices or philosophies, it is for the Legislature, not the Governor, to curtail that discretion. Whatever evils may flow from the exercise of unfettered discretion in the decision-making process, they are not addressed or remedied by the self-appointed transfer of discretion from one individual to another. If sustained in this context, supersession becomes an avenue to bypass the legislative scheme, within which the District Attorney is a key actor, and to supplant the legislative policy by giving that discretion to the Attorney-General. This is particularly true, and is constitutionally suspect, when the party from whom discretion is removed was granted that discretion by the Legislature.
Additionally, the Governor stated that the speed within which the Bronx District Attorney decided not to seek the *242 death penalty demonstrated that the District Attorney failed to engage in a reasoned, case-by-case evaluation and, as such, necessitated the Governor’s intervention. This argument is not supportable. First, as stated previously, this "evaluation” by the Governor nullifies the statutory grant of discretion given to District Attorneys. Second, in this exacting, carefully crafted legislation which reinstates the death penalty, there is no language requiring a District Attorney to engage in any particular decision-making process before stating his or her intention with respect to the death penalty. In fact, while the statute provides that each District Attorney has 120 days in which to file a notice to seek the death penalty and he or she may decide to withdraw that notice whenever appropriate, the legislative history also demonstrates that:
"[a] prosecutor may determine at any time that the death penalty will not be sought in a particular case. Thus, a prosecutor may determine immediately following a charge that the death penalty will not be sought or may make such a determination at any stage of a prosecution thereafter. In such cases, as described in subdivision one of Section 400.27 of the Criminal Procedure Law, a prosecutor may seek a sentence of life without parole” (Mem of Assembly Codes Comm, 1995 NY Legis Ann, at 1, 4 [emphasis added]).
Thus, the timing of a District Attorney’s articulation of his or her statutory right of discretion to seek the death penalty is of no moment and does not support the Governor’s supersession here.
Finally, the Governor’s intervention and supersession in this case is inconsistent with the language and policy of the capital statute because it implicitly, if not explicitly, suggests that in the face of certain crimes, the death penalty is the more appropriate penalty. But nowhere in its text or history does the statute require that such a penalty be sought or imposed. As one sponsor stated, the law "allows imposition of the death penalty in certain instances” (Mem of Assembly Member Vitaliano, at 1, Bill Jacket, L 1995, ch 1), it does not mandate it. The capital statute does not create or suggest a hierarchy within the sentencing options; the sentence of death was not denominated a more just or optimal sentence. To the contrary, the statute’s sponsors stated that "[l]ike the death penalty, [life imprisonment without parole] is a more severe sentence than *243 any currently provided under the penal law. It should thus be reserved for the most heinous crimes and the most hardened offenders” (Mem of Assembly Codes Comm, 1995 NY Legis Ann, at 1, 5).[6]
V.
In sum, I conclude that this appeal is moot and should be dismissed and the orders below vacated. However, on the merits, I would reverse because the Governor’s supersession has no rational basis because it undermines the legislative scheme granting District Attorneys the discretion to choose, or not to choose, the penalty of death.
Judges Bellacosa, Levine and Wesley concur with Chief Judge Kaye; Judge Titone dissents and votes to reverse in a separate opinion; Judge Smith dissents and votes to dismiss as moot in another opinion in which Judge Ciparick concurs.
In each case: Order affirmed, without costs.

. The two codefendants, Ricardo Morales and Jesus Mendez, were indicted in Bronx County of murder in the second degree and related offenses in connection with the death of Officer Gillespie. However, Mendez and Morales were later tried in Federal court and convicted of violating the Racketeer Influenced and Corrupt Organizations statute (18 USC § 1962 [c]) under an indictment which explicitly included the murder of Officer Gillespie. Defendant Mendez was sentenced by the Federal court to a term of life plus 125 years and defendant Morales received a sentence of life imprisonment plus 105 years. On August 26, 1997, Supreme Court, Bronx County, with the consent of the People, dismissed the indictment against both defendants. Based on these facts, the Attorney-General argues that this case is moot. The Attorney-General recognizes, and has stated, that with the dismissal of the indictment, the relief sought by the District Attorney would have no effect on the parties.

. Several months after superseding the Bronx District Attorney and appearing in the case pursuant to the Governor’s Executive Order No. 27, the Attorney-General declared his intention to seek the death penalty against defendant Diaz.

. The three elements described above constitute the exception to the mootness doctrine. Each element is not, separately, an exception to the mootness doctrine. Thus, in order to find that an issue should be excepted from the mootness doctrine it must be demonstrated that all three elements apply in the action (see, e.g., Matter of Chenier v Richard W., 82 NY2d 830, 832 [stating that appeal may be retained if it satisfies "the three critical conditions to the mootness exception”]). Thus, while the existence of one element of the mootness exception may be demonstrated, if the others are not also met, the exception is not triggered or applicable (see, e.g., Matter of Hearst Corp. v Clyne, supra, at 715 [acknowledging the existence in the case of one element of the mootness exception, namely, the possibility that the issue may escape review, but still holding that the issue should not "be preserved as an exception to the mootness doctrine”]).

. Capital punishment, by means of the electric chair, was instituted in New York in 1888. The Nation’s first electrocution took place in New York in 1890. Beginning in 1973 through 1984, this Court struck down various capital statutes due to constitutional defects (see, People v Fitzpatrick, 32 NY2d 499, cert denied 414 US 1033; People v Davis, 43 NY2d 17, cert denied 435 US 998; People v Smith, 63 NY2d 41, cert denied 469 US 1227). From 1978 to 1994, Governors Carey and Cuomo vetoed all death penalty bills passed by the Legislature (see generally, Acker, New York’s Proposed Death Penalty Legislation: Constitutional and Policy Perspectives, 54 Alb L Rev 515; Lumer and Tenney, The Death Penalty in New York: An Historical Perspective, 4 J L & Pol’y 81).

. It should be noted that when the Legislature envisioned the participation or assistance of the Attorney-General and Governor in the prosecution or appeal of a death penalty case, it did so only upon the request of the District Attorney. Specifically, Executive Law § 63-d (1) provides "The attorney-general shall, whenever required by the governor or his designee after a request of the governor by a district attorney, direct that the resources and personnel of the department of law be used to provide assistance relating to the prosecution or appeal of any case where the defendant may be subject to the penalty of death.” Thus, a District Attorney can request assistance from a Governor in a death penalty case. This does not mean that, in the absence of a request, a Governor may supersede the District Attorney. Executive Law § 63-d provides only that assistance by the Attorney-General may be given to a District Attorney upon request of the District Attorney to the Governor.

. Thus, a District Attorney cannot be said to have ignored or failed to abide by the law by choosing one of the options given to him or her by the Legislature. In this particular case, the Governor believed that the Bronx District Attorney had a "blanket policy” against the death penalty and would never seek its imposition. The Bronx District Attorney has denied the existence of such a "blanket policy” and asserts that the door has been left open, however slightly, to the imposition of the death penalty. Again, the statute does not require a District Attorney to seek death. The Bronx District Attorney complied with the statute.